## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ANITA D. O., | § | |
| Plaintiff, | § | |
| | § | |
| | § | Civil Action No. 3:17-CV-1728-D |
| | § | |
| NANCY A. BERRYHILL, ACTING | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

By *Standing Order of Reference* filed July 17, 2017 (doc. 8), this action has been referred for determination of non-dispositive motions and issuance of findings, conclusions and recommendation on dispositive motions. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed November 2, 2017 (doc. 16), and *Defendant's Motion for Summary Judgment*, filed December 1, 2017 (doc. 19). Based on the relevant filings, evidence, and applicable law, the plaintiff's motion should be **GRANTED IN PART**, the defendant's motion should be **DENIED IN PART**, the Commissioner's decision should be **REVERSED IN PART**, and the case should be **REMANDED** for further proceedings.

### I. BACKGROUND[1]

Anita D. O. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act (Act), and for supplemental security income (SSI) under Title XVI of the Act. (*See* docs. 1; 16.)

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

A.    **Procedural History**

 On March 24, 2014, Plaintiff filed her applications for a period of disability, DIB, and SSI, alleging disability beginning on April 2, 2013.  (R. at 17, 83, 98.)  Her claims were denied initially on July 10, 2014, and upon reconsideration on September 24, 2014.  (R. at 112-13, 127-28  )  On October 26, 2014, Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. at 17, 146-47.)  She appeared and testified at a hearing on January 20, 2016.  (R. at 17, 46-68.)  On March 1, 2016, the ALJ issued a decision finding her not disabled and denying her claim for benefits.  (R. at 17-40.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on April 26, 2016.  (R. at 13.)  The Appeals Council denied her request for review on April 26, 2017, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-7.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

B.    **Factual History**

1.    **Age, Education, and Work Experience**

Plaintiff was born on December 15, 1963, and was 52 years old at the time of the hearing.  (R. at 49, 188.)  She had at least a high school education and could communicate in English.  (R. at 49, 600.)  She had past relevant work experience as a sandwich maker, short order cook, kitchen helper, and child daycare center worker.  (R. at 39.)

2.    **Medical Evidence**

On January 26, 2012, and January 27, 2012, Plaintiff saw Patricia McClain, N.P., at the Greater Texoma Health Clinic (GTHC).  (R. at 314, 336.)  At the first appointment, Plaintiff underwent a depression screening, which indicated that she had severe depression.  (R. at 314.)  At

times she thought of hurting herself, or thought that she would be better off dead. (*Id*.) She reported having a history of anxiety and stated that Prozac helped when she took it. (R. at 315.) She also previously took Buspar for anxiety but could not remember if it helped. (*Id*.) At the second appointment, Plaintiff complained of lower back pain. (R. at 336.) Nurse McClain noted that Plaintiff worked at Subway and did heavy lifting one day per week, and she had a history of low back pain that was getting worse. (*Id*.)

On September 7, 2012, Plaintiff underwent another depression screening. (R. at 316.) This screening indicated only mild depression; she did not think about hurting herself or that she would be better off dead. (*Id*.) She was alert, oriented, in no acute distress, cooperative, depressed, and anxious, and had full range of motion, mild swelling in her right ankle, normal motor strength, and intact cognitive function. (R. at 316-17.)

On February 10, 2014, and March 24, 2014, Plaintiff met with Nancy Davis, N.P. (R. at 296, 357.) In February, Nurse Davis noted that Plaintiff had a history of rheumatoid arthritis, hypertension, thyroid enlargement, acid reflux, and tobacco use. (R. at 296) Plaintiff reported that she had swelling in her right elbow and hand, and that her joints were tender. (*Id*.) She also stated that she occasionally dropped things. (*Id*.) Her right elbow had slight erythema with swelling and a trace of warmth. (R. at 297.) She was alert, oriented, well-developed, well-nourished, and in no acute distress. (*Id*.) In March, she again reported problems with her arms, felt that her arms were twitching, and stated that she dropped items on occasion. (R. at 357.) She complained that her arms fell asleep at night, her joints were painful, and her joints and elbows were swollen. (*Id*.) She denied having blurry vision, dizziness, headaches, or weakness. (*Id*.)

On March 19, 2014, Plaintiff met with Nurse McClain at the GTHC for hypertension. (R.

at 304.)  She was taking Lisinopril for her hypertension.  (*Id*.)  She was normal, alert, oriented, depressed, and in no acute distress.  (*Id*.)  Her spine was non-tender to palpation, she had normal range of motion, and there was no evidence of clubbing, cyanosis, or edema in her extremities.  (*Id*.)  Plaintiff reported frequent headaches, blurry vision, chronic back pain, back spasms, being very stressed, and feeling depressed.  (R. at 305-06.)  She did not think Prozac was helping her depression.  (R. at 306.)

On April 4, 2014, Plaintiff underwent an MRI on her cervical spine.  (R. at 349.)  The MRI showed mild multilevel cervical degenerative disc disease and spondylosis resulting in mild central canal stenosis at C5-C6, and mild right and minimal left neural foraminal stenosis at C5-C6.  (R. at 350.)  The MRI also revealed degenerative disc disease in the cervical region.  (R. at 376.)

On April 14, 2014, in her Function Report - Adult, Plaintiff reported that she had pain, numbness in her fingers, and spasms.  (R. at 242.)  She also reported that her hands hurt very badly and caused her to toss and turn, so she could not sleep.  (R. at 243.)  She lived with her family, and her daily activities consisted of getting up, dropping her kids off at school, cleaning, cooking, taking care of her kids, and getting ready for bed.  (R. at 242-43.)  It used to take her about an hour to cook complete meals on a daily basis, but it had started taking longer since her conditions began.  (R. at 244.)  She was also able to do household chores inside and outside for about 2-3 hours daily, and she could grocery shop, which she did about once a month.  (R. at 244-45.)  She did not drive and did not go out alone because she needed help due to her nerves being "real bad."  (R. at 245.)  She could pay bills, count change, handle a savings account, and use a checkbook or money order.  (*Id*.)  She enjoyed watching television and stated that it was hard for her to sit still for very long.  (R. at 246.)  Her conditions affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb

4

stairs, use her hands, and get along with others.  (R. at 247.)  She could not lift or squat and could

only walk 30 yards before needing to rest for at least 5 minutes.  (*Id*.)

On May 12, 2014, and June 19, 2014, Plaintiff went to see Dr. Kenneth Anderson at New

Horizons Pain Care Center (NHPCC).  (R. at 375-76, 384-86.)  In May, Plaintiff complained of low

back and neck pain "since the 1980s," but it had become worse over the years.  (R. at 376.)  She did

not recall a specific accident or injury that precipitated the pain.  (*Id*.)  She described the pain as

constant, throbbing, sharp, and shooting in nature.  (*Id*.)  Sitting or laying down made the pain better,

but bending, lifting, standing, day-to-day living, and other activities made her pain worse.  (*Id*.)  Dr.

Anderson noted that she had a remote history of receiving "some type of injection into her low

back."  (*Id*.)  Without activity, her pain was at a 9 on the pain scale, and with activity, it was at a 10.

(*Id*.)  Her range of motion was limited and secondary to pain.  (R. at 377.) In June, she reported that

she had pain primarily in her lower back.  (R. at 386.)  Her pain was at a 9 on the pain scale that day,

but on a good day, her pain was at as low as a 6.  (*Id*.)  She had an equal number of good and bad

days over the previous few weeks.  (*Id*.)  She previously had an epidural steroid injection that

decreased her pain.  (*Id*.)  Plaintiff tested negative on her drug screening, and Dr. Anderson provided

her with a withdrawal of care letter because she violated their pain management contract.  (*Id*.)

On May 24, 2014, Plaintiff visited Mark Nguyen, M.D., for an evaluation.  (R. at 363-69.)

He noted that Plaintiff had a past medical history of rheumatoid arthritis, irritable bowel syndrome,

hypertension, and chronic low back pain.  (R. at 368.)  She reported functional limitations of sitting

10-20 minutes, standing 10-15 minutes, walking 50-60 yards, and lifting and carrying 20 pounds

frequently and 30 pounds occasionally due to her back and neck problems.  (R. at 365.)  She was

in no acute distress, alert, oriented to time, place, person, and situation, and had good eye contact,

fluent speech, appropriate mood, clear thought process, good concentration, and normal memory. (R. at 365-66.) She had no palpable muscle spasms, and her straight leg test was positive at 45 degrees on the left. (*Id*.) She had no joint swelling, erythema, effusion, or deformity, but there was some slight point tenderness along her lumbar spine. (R. at 367.) She was able to lift, carry, and handle light objects, but unable to squat or rise from a squatting position. (*Id*.) She could rise from a sitting position without assistance, had some difficulty getting up and down from the exam table, and could not walk on heels or toes. (*Id*.) Tandem walking was abnormal, and she could not stand on either foot bilaterally. (*Id*.) She could also dress and undress adequately well, was cooperative, and gave good effort during the examination. (*Id*.) She had normal range of motion throughout. (R. at 368.) Dr. Nguyen found that it was most likely Plaintiff had a "slipped disc or disc herniation resulting in nerve impingement in the lumbar spine." (R. at 368-69.) He also found that she had "probable chronic knee and low back pain from osteoarthritis secondary to most likely obesity." (R. at 369.) He ultimately determined that Plaintiff could sit normally in an 8-hour workday with normal breaks; had mild limitations with standing and walking due to back pain; did not need an assistive device; had mild limitations with lifting and carrying due to back pain; could occasionally bend, stoop, crouch, and squat with limitations; had no limitations on reaching, handling, feeling, grasping, and fingering; had no relevant communicative or work place environmental limitations; and could have relevant visual limitations. (*Id*.) Dr. Nguyen ordered x-rays of Plaintiff's lumbar spine, which showed moderate degenerative changes. (R. at 370.)

On June 26, 2014, Plaintiff saw Shawna O'Donley, P.A., at the Grayson County Health Clinic (GCHC) complaining of a painful rash on her hands. (R. at 582.) She reported that her hands felt like they were "on fire and just burn[t] all the time," and the pain was worse on the left than the

right. (*Id*.) She also reported feeling depressed over the previous 6 months, and expressed interest in starting an antidepressant. (*Id*.) She denied having painful joints and weakness, and denied suicidal thoughts, substance abuse, mental abuse, or physical abuse. (*Id*.) She further complained of stress and difficulty sleeping. (*Id*.) She was alert, oriented, and cooperative, with good judgment, insight, and thought content. (R. at 583.) She did not have suicidal ideation or delusions, appeared anxious, and her thought process was logical and goal-directed. (*Id*.) She was assessed with joint pain in her upper arm, rheumatoid arthritis, and depressive disorder. (*Id*.)

On July 10, 2014, Andrea Fritz, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) assessment of Plaintiff based on the medical evidence. (R. at 77-79.) She opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk (with normal breaks) for about 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight, other than shown for lift and carry, including operation of hand and foot controls; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance; frequently stoop; and occasionally kneel, crouch, and crawl; with no manipulative, visual, communicative, or environmental limitations. (R. at 77-78.) Dr. Fritz referenced Plaintiff's physical consultive examination, lumbar x-ray, treatments at NHPCC, and treatments at GCHC. (R. at 78-79.) She also noted that Plaintiff's allegations were partially supported by the evidence in the file. (R. at 79.)

On September 19, 2014, Roberta Herman, M.D., an SAMC, also completed a physical RFC of Plaintiff. (R. at 107-09.) Her findings were identical to those made by Dr. Fritz. (*See id*.)

Also on July 10, 2014, Caren Phelan, Ph.D., a state agency psychological consultant (SAPC),

completed a mental RFC assessment of Plaintiff based on the medical evidence. (R. at 79-81.) She opined that Plaintiff was no more than moderately limited in the areas of understanding, memory, sustained concentration, and persistence. (R. at 79-80.) She found that Plaintiff had no social interaction or adaptation limitations. (R. at 80.) Plaintiff could understand, remember, and carry out detailed but not complex instructions, make decisions, concentrate for extended periods, interact with others, and respond to changes. (*Id*.) She noted that Plaintiff's allegations were not supported by the evidence in the file. (*Id*.)

Nancy Wilson, Ph.D., an SAPC, completed a subsequent mental RFC of Plaintiff on September 24, 2014. (R. at 109-11.) She opined that Plaintiff was no more than moderately limited in the areas of understanding, memory, sustained concentration, persistence, and social interaction. (R. at 110-11.) She found that Plaintiff had no adaptation limitations. (R. at 110.) She further opined that Plaintiff could understand, remember, and carry out detailed but not complex instructions, make decisions, concentrate for extended periods, interact with others, and respond to changes. (R. at 111.) She also noted that Plaintiff's allegations were not fully supported by the evidence in the file. (*Id*.)

On August 14, 2014, Plaintiff reported extreme depression that had been going on for years, as well as a lot of crying and suicidal thoughts. (R. at 411.) She had suicidal ideation for a long time but never attempted suicide. (*Id*.) She also reported severe physical issues such as "hot and cold snaps." (*Id*.) She sometimes twisted and pulled her hair out and forced paper under her fingernails, evidence of which was present. (*Id*.) A mental status exam showed that Plaintiff was well-groomed, crying, alert, depressed, oriented, and goal-directed. (R. at 412.) She had good eye contact, normal movement, normal speech, and fair memory, concentration, insight, and judgment.

(*Id.*)  Both suicidal and homicidal ideation were present.  (*Id.*)

In a crisis response/screening log from August 18, 2014, Plaintiff reported that she was diagnosed with depression and was on 8 or 9 medications, but she could not afford them all.  (R. at 415.)  She was overwhelmed and had "thoughts of killing" herself, but then stated that she had two young children and would never hurt herself.  (*Id.*)  She stated that she had a history of being sexually abused and raped, and that she had not had a job for over a year, which gave her time to think about the past.  (*Id.*)  She admitted having thoughts of hurting her abuser, but denied any intent or plan.  (*Id.*)  She spoke about her physical pain and the limitations it placed on her life, and stated that she saw things pass by her daily since her mother passed away.  (*Id.*)  Plaintiff was encouraged to keep busy and follow-up regarding a medical appointment.  (*Id.*)

On March 11, 2015, April 9, 2015, and April 30, 2015, Plaintiff received epidural injections for pain management.  (R. at 424-27.)  She tolerated each procedure well and was subsequently discharged.  (*Id.*)

On May 19, 2015, Plaintiff was seen by Shyama Satyan, M.D., for seizure-like activity and leg weakness.  (R. at 448.)  Dr. Satyan found Plaintiff positive for seizure-like episodes, leg weakness, and somnolence, which she believed was related to Ativan.  (R. at 449.)  She noted that Plaintiff was able to stand up and use "the bedside commode in the hospital, so there [was] definitely embellishment."  (*Id.*)  Dr. Satyan ordered MRIs, a CT scan, and an EEG test.  (R. at 450.)  The following day, Plaintiff underwent those tests.  (R. at 458, 461, 462, 464.)  An MRI on her lumbar and thoracic spine showed multilevel degenerative changes and central canal stenosis greater at L4-5 than L3-4.  (R. at 460.)  An MRI on her cervical spine showed multilevel degenerative disc disease, most conspicuous at the C56 level, a 2.9mm bulge, and mild central stenosis.  (R. at 461.)  Dr.

Satyan's reading of the MRIs found no true radiculopathy, no true nerve root compression, and lumbar canal stenosis that was mild at most.  (R. at 446.)  The CT scan of Plaintiff's head showed no intracranial abnormalities.  (R. at 462.)  The EEG test for Plaintiff's seizures showed no focal epileptiform abnormality or electrographic seizure activity to explain Plaintiff's generalized shaking or altered mental status.  (R. at 465.)

Plaintiff saw Nurse Davis again on May 22, 2015.  (R. at 563.)  She reported that she had a slight stroke and fell, and that ambulance personnel told her that she "may have had a possible seizure or stroke."  (*Id.*)  Nurse Davis noted that Plaintiff had a history of severe degenerative disc disease in her spine, was receiving treatment on her back, and had previously seen Dr. Anderson for pain management.  (*Id.*)  She also noted that Plaintiff had some "jerking movements," but she was unsure if she had a true seizure disorder.  (*Id.*)  She was taking Keppra for seizures.  (*Id.*)  Nurse Davis assessed Plaintiff with depression, degeneration of her cervical intervertebral disc, other idiopathic peripheral autonomic neuropathy, and other forms of epilepsy and recurrent seizures, without mention of intractable epilepsy.  (R. at 564.)

On June 4, 2015, Plaintiff saw Andres G. Morales, D.O., for joint pain.  (R. at 543.)  She was alert, cooperative, pleasant, and obese.  (*Id.*)  She had normal straight leg raises, and her range of motion was normal but with some discomfort with rotation.  (R. at 544.)  Dr. Morales found that Plaintiff had a very histrionic personality and embellished her examination.  (*Id.*)  He noted that she had nocturnal paresthesias, a recent diagnosis of diabetes, and possible underlying fiber neuropathy.  (R. at 544-45.)  He reviewed her MRIs and found degenerative disc disease with a small bulge and minimal canal stenosis, but recommended no further epidural injections as they were not beneficial.  (R. at 545.)  He did not suggest any neurosurgical intervention.  (*Id.*)  He witnessed Plaintiff have

stuttering speech that became worse as the examination went on, and she also had tremors.  (*Id*.)

He believed the stuttering speech and tremors were of a psychogenic origin, and he discontinued her

Keppra.  (*Id*.)  He recommended physical therapy and advised that she see a mental health

professional for her depression and anxiety.  (*Id*.)

On June 16, 2015, August 10, 2015, and September 3, 2015, Plaintiff met with Lee A.

Purtthipatkool, F.N.P.  (R. at 555, 557, 560.)  In June, Plaintiff had diabetes and blood pressure

concerns.  (R. at 560.)  Her blood pressure had been higher, and she had headaches when it was

high.  (*Id*.)  She was having a lot of nerve pain and some seizure activity, and she reported that she

did not drive.  (*Id*.)  In August, she complained that she had problems sleeping, her left arm was "not

turning over good," her medications were not working, her right hand was "shaking a lot," she was

still stuttering, and there was fluid in her right knee.  (R. at 557.)  She was also having "trouble

opening" the elbow of her left arm.  (*Id*.)  In September, she reported chronic back pain and pain in

her elbows and right knee, and she felt like she was in too much pain.  (*Id*.)  Nurse Purtthipatkool

noted that Plaintiff previously had an MRI on her back, was seeing a doctor for seizures and nerve

pain, and also had carpal tunnel syndrome.  (*Id*.)

On June 26, 2015, Plaintiff's husband called an ambulance after finding Plaintiff standing

by her bed calling his name.  (R. at 523.)  Plaintiff was stuttering and stated that she could not move,

but was able to sit on her bed after about 5 minutes.  (*Id*.)  When the ambulance arrived, Plaintiff

was stuttering while answering questions, but her speech cleared up the more the emergency medical

services (EMS) team spoke with her.  (*Id*.)  She refused to go to the hospital because she received

no diagnosis at her previous hospital visits, but she allowed EMS to obtain a blood sugar reading.

(*Id*.)  She was eventually speaking in clear sentences, and no apparent injuries or illnesses were

noted.  (*Id.*)

On August 3, 2015, Plaintiff saw Dr. Satyan for a consultation regarding her seizures.  (R. at 471.)  Plaintiff reported that she woke up around 4 a.m. and could not move her left arm, and that she was having "too much pain in both hands."  (*Id.*)  She previously had right carpal tunnel surgery, but the pain did not go away.  (*Id.*)  She was unable to use her right hand and also had pain in her left hand.  (*Id.*)  Plaintiff had been stressed and depressed, which caused her to have more frequent seizures.  (*Id.*)  She denied any suicidal or homicidal ideation.  (R. at 475.)  Plaintiff reported having 14 seizures since May 19, 2015.  (R. at 471.)  She had seizures two days prior to her appointment, and on that occasion, she had "one short seizure and then 30 minutes later she had a full-blown one."  (*Id.*)  Dr. Satyan noted that Plaintiff was an extremely anxious patient.  (R. at 472.)  She also noted that based on her observation, most of Plaintiff's "spells" had been non-epileptic.  (R. at 474.)  She increased Plaintiff's Keppra.  (*Id.*)  She thought that Plaintiff had either fibromyalgia or chronic pain syndrome, recommended depression management, and opined that Plaintiff would benefit from a psychiatric evaluation for management of her depression and stress.  (R. at 475.)

On August 24, 2015, Plaintiff was seen again by Dr. Morales.  (R. at 531.)  She reported pain in her left hand that was worse than her right, and stated that she had trouble sleeping due to the pain.  (*Id.*)  She also reported that she had a seizure on the Sunday before her appointment, which occurred while she attended church, even though she continued to take Keppra.  (*Id.*)  She was alert, cooperative, pleasant, and obese, and had normal range of motion, tenderness in her lumbosacral and thoracic spine, and no clubbing, cyanosis, or edema.  (R. at 531-32.)  Dr. Morales noted that he witnessed Plaintiff's seizure-like episodes and found that they were consistent with psychogenic non-epileptic events.  (R. at 533.)

On October 8, 2015, Plaintiff met with Nurse McClain again at the GTHC to re-establish her care.  (R. at 594.)  She was in no acute distress, well-developed, well-nourished, alert, oriented, goal-directed, and her thought process was logical.  (*Id.*)  Her short-term memory was impaired, she stuttered frequently, and her gait was slow but steady.  (*Id.*)  Plaintiff reported that she had bilateral carpal tunnel surgeries but had not noticed any relief, and had cervical bulging discs for which she received injections that did not help.  (R. at 595-96.)  She also reported sudden onsets of muscle weakness, aphasia, and a new onset of stuttering.  (R. at 596.)  She stated that she went to the emergency room, was started on Keppra, and was still having seizures even though she was taking her medications.  (*Id.*)

Plaintiff had a follow-up at GTHC with Jack Childress, M.D., on October 13, 2015 for evaluation of her continued seizures.  (R. at 592.)  She appeared normal and in no distress, and was appropriately groomed and dressed.  (*Id.*)  Dr. Childress noted that Plaintiff had no clubbing, cyanosis, or inflamed joints, but her gait was slow due to her pain.  (*Id.*)  She was oriented to person, place, time, and situation, and had normal judgment, insight, memory, and recall.  (*Id.*)  Dr. Childress assessed her with localization related symptomatic epilepsy and epileptic syndromes with complex partial seizures that were not intractable, and "without status epilepticus."  (*Id.*)  He determined that she should continue on Keppra, and planned to add Lamictal if the seizures increased.  (*Id.*)

On November 9, 2015, Plaintiff met with George R. Mount, Ph.D., for a clinical interview and mental status examination.  (R. at 600.)  Dr. Mount noted that Plaintiff was punctual for her appointment, and was able to complete the interview and testing.  (*Id.*)  She was cooperative, reliable, alert, oriented to time, place, person, and situation, casually dressed, and fairly groomed.

13

(R. at 600, 602.) She needed assistance to walk to the testing room, reported pain and muscle cramps, and had to stand up at times. (R. at 600.) She reported sexual abuse as a child. (*Id*.) She last worked as a sandwich maker at Subway in April of 2013, but was terminated for an unknown reason. (*Id*.) She had trouble getting to sleep and staying asleep, problems with her memory since she began having seizures, and she found it hard to care for her own personal hygiene. (R. at 601-02.) She had fallen while taking a bath four times. (R. at 601.) She cooked "every now and then," and could not attend to household chores or grocery shop; she relied on her common law husband to do those things for her. (*Id*.) She did not have a driver's license, did not socialize with others, and spent most of her time at home. (*Id*.) She did not have any friends and could manage her own funds. (*Id*.)

Dr. Mount noted that her behavior was restless, she stuttered at times, her thought process was goal-directed, she had no psychotic features, she had a depressed and labile mood, her general knowledge was average, and her level of intellectual functioning was estimated to be average. (R. at 602.) Her remote memory and recent memory were intact, her immediate memory was marginal, and her judgment and reasoning were logical and functional. (*Id*.) She could recall 3 of 5 words after 5 minutes, could repeat 5 digits forwards and 3 backwards, could not do Serial 7's, but could do Serial 3's, and she could spell "world" backwards correctly. (*Id*.) Personal assessment inventory testing revealed severe anxiety and depression, and she placed above the optimal cutoff score for patients with posttraumatic stress disorder (PTSD). (*Id*.) Plaintiff's scores in her P3[2] pain patient profile for depression, anxiety, and somatization were all above average. (*Id*.) Dr. Mount's

---

[2] "The P3 was designed to identify patients who are experiencing emotional distress associated with pain as a result of disease." (R. at 602.)

diagnostic impression was major depressive disorder that was recurrent and severe without psychotic features, chronic PTSD, somatization disorder, and paranoid personality disorder. (R. at 603.)

Dr. Mount also completed a mental RFC evaluation of Plaintiff on November 9, 2015. (R. at 604-07.) He opined that she was markedly limited in her abilities to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule and maintain attendance; sustain an ordinary routine without special supervision; work in coordination with others without being distracted by them; complete a normal workday and week without interruptions from psychologically based symptoms and perform at a consistent pace; interact appropriately with the general public; accept instructions and respond appropriately to criticism; get along with coworkers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation. (R. at 604-05.) She was also moderately limited in her abilities to remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; ask simple questions or request assistance; and be aware of normal hazards and take appropriate precautions. (*Id.*)

It is unclear whether Dr. Mount found Plaintiff to be moderately limited, markedly limited, or in between in her abilities to make simple work-related decisions, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and set realistic goals or make plans independently of others; both limitations are marked and connected by a line for each ability. (*See id.*) He also opined that Plaintiff was unlikely to tolerate having her work judged and evaluated by a supervisor; could not benefit from a supportive workplace environment or accommodations; and could not sustain a normal workday or workweek without significant interruptions (beyond any

scheduled breaks) from psychologically based symptoms.  (R. at 606.)

Also on November 9, 2015, Plaintiff underwent a personality assessment with Leslie C. Morey, Ph.D.  (R. at 608.)  Plaintiff viewed her life as disrupted by many physical problems, some of which were likely related to marked stressors.  (R. at 613.)  She demonstrated somatic concerns unusual in clinical samples, and symptoms consistent with both conversion and somatization disorders.  (R. at 613-14.)  She reported experiencing severe fears or anxiety in certain situations, as well as depression and anxiety that was unusual in clinical samples.  (R. at 614.)  Dr. Morey opined that Plaintiff likely experienced a traumatic event in the past.  (*Id.*)  Plaintiff felt a great deal of tension and had difficulty relaxing, and she described problematic personality traits, reported problems of many different types, and her descriptions indicated suspiciousness and hostility in her relationships with others.  (R. at 615.)  She also reported experiencing intense and recurrent suicidal thoughts.  (R. at 616.)  She appeared to have a substantial interest in making changes in her life, and was motivated for treatment.  (R. at 617.)  Diagnostic considerations included major depressive disorder, PTSD, social phobia, somatization disorder, paranoid personality disorder, and borderline personality disorder.  (R. at 618.)

On November 24, 2015, Plaintiff went to the Texoma Medical Center complaining of pain all over her body, including lower back pain.  (R. at 635.)  A review of systems showed back pain, muscle pain, and depression.  (*Id.*)  She was alert, oriented to person, place, time, and situation, crying, and in mild distress and pain.  (R. at 637.)  She had normal sensory and motor function, and her speech and coordination were normal.  (*Id.*)  She also had normal range of motion, appropriate mood and affect, normal judgment, and was cooperative.  (*Id.*)

On December 19, 2015, Dr. Mount opined that Plaintiff had medically determinable

impairments of major depressive disorder, somatization disorder, and paranoid personality disorder. (R. at 654.)  He noted that the medical evidence and testing he performed established physical and mental impairments consistent with Plaintiff's statement of symptoms, the medically determinable impairments could reasonably be expected to produce Plaintiff's symptoms, and Plaintiff's description of her physical and mental impairments was credible.  (*Id*.)  He opined that it was reasonable for Plaintiff to complain that she could not sit, stand, and walk as needed to perform competitive work, for her to exaggerate her physical limitations to the extent she would believe she could not perform the physical demands of competitive work, and for her to be absent from work 3 or more days per month due to her physical complaints and her perception that she could not even perform basic activities of daily living.  (R. at 654-55.)  He also noted that Plaintiff had a history of rheumatoid arthritis, pain, seizures, PTSD, and depression.  (R. at 655.)

### 3.    Hearing Testimony

On January 20, 2016, Plaintiff, her significant other, and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 47-68.)   Plaintiff was represented by a non-attorney representative.  (R. at 48.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that she was 52 years old, divorced, had seven children, and had graduated high school.  (R. at 49.) She could not go back to work because of her back problems, depression, stress, seizures, diabetes, and high blood pressure.  (*Id*.)  Plaintiff's representative then asked Plaintiff how much of her physical problems were a result of her emotional state of mind. (R. at 51.) Plaintiff was unable to respond, and her representative informed the ALJ that he thought she was "having some type of seizure." (*Id*.)  Plaintiff's representative informed the ALJ that Plaintiff would

be unlikely to respond until her seizure subsided.  (R. at 51-52.)  As a result, Plaintiff submitted no

further testimony, and her significant other, Mr. Killion, was called to testify.  (*See* R. at 51-52.)

### b.    *Mr. Killion's Testimony*

Mr. Killion testified that Plaintiff's seizure-like episodes happened approximately three times

per month, and they were sometimes stress-related.  (R. at 53.)  He stated that Plaintiff would shake,

and she had been through "things" during her childhood.  (*Id*.)  The ALJ asked Mr. Killion how

many of Plaintiff's physical problems were physical as opposed to emotional.  (*Id*.)  He responded

that 70 percent were mental, and 30 percent were physical.  (R. at 53-54.)

He stayed/lived with Plaintiff almost every day, and he had been with her for 10 years.  (R.

at 54.)  Plaintiff had stress from dealing with her kids, not being able to do things on her own, not

being able to move around, and from pain, which to be getting worse.  (*Id*.)  He was with her when

she started going to the mental health center, and he went to visit doctors and hospitals with her.

(R. at 55.)  He testified that a doctor told Plaintiff she could not pick up anything that weighed more

than 3-5 pounds.  (*Id*.)  Plaintiff had been in the hospital for one of her seizure-like episodes in the

previous month, and after those episodes, she would be very tired and sometimes had headaches.

(R. at 55-56.)  He stated that he and Plaintiff's sister took cooked and cleaned the house.  (R. at 56.)

Plaintiff was taking medications for seizures, depression, anxiety, and pain.  (R. at 56-57.)  Mr.

Killion stated that Plaintiff was depressed, suffering badly every day, rarely had half of a good day,

and could not get out and do things.  (R. at 57.)  He also stated that she needed help bathing and

getting dressed, and he and her sister helped her.  (*Id*.)  Plaintiff had a cane on the day of the hearing,

but Mr. Killion did not know if it was prescribed by a doctor.  (*Id*.)  He described her walking ability

as slow, and stated that she had hip pain the morning of the hearing, and would complain of tingling

going down her legs.  (R. at 58.)

> ### c.    VE's Testimony

The ALJ asked the VE if Plaintiff could work as a cashier if she had the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; sit, walk, and stand for 6 hours in an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance; frequently stoop; occasionally kneel, crouch, and crawl; understand, remember, and carry out detailed but not complex instructions; make decisions; concentrate for extended periods; interact with others; respond to changes; and have only frequent contact with others.  (R. at 60.)  The VE responded that she could, and that cashier was light level work, with an SVP of 2.  (R. at 60-61.)

Plaintiff's representative asked the VE if Plaintiff would be able to perform any work at all if she were unable to maintain attention, concentration, and persistence of pace for periods of two hours or more at a time.  (R. at 61.)  The VE responded that she would not.  (*Id*.)  He then asked if she would be able to maintain a job if she were absent from work two or more days per month and unable to have regular job attendance.  (*Id*.)  The VE responded that she would not.  (R. at 62.)  He asked if Plaintiff would be able to perform work if she was unable to work in coordination with supervisors or coworkers, or was precluded from contact with supervisors.  (*Id*.)  The VE responded that she would not.  (*Id*.)  He next asked if Plaintiff would be able to work if she were unable to complete a normal 8-hour workday without interruptions from psychologically based symptoms. (*Id*.)  The VE responded that she would not.  (*Id*.)

The ALJ asked the VE if Plaintiff would be able to do any job other than cashier that did not require frequent contact.  (*Id*.)  The VE responded that she could work as a short order cook, which was light level work with an SVP of 3.  (R. at 63.)  The VE stated that she would not have frequent

public contact as a cook.  (*Id.*)

**C.   ALJ's Findings**

The ALJ issued his decision denying benefits on March 1, 2016.  (R. at 17-40.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 2, 2013, the alleged onset date.  (R. at 19.)  At step two, the ALJ found that she had the following severe impairments: pain; degenerative disc disease; stenosis; arthritis; diabetes; hypertension; irritable bowel syndrome; acid reflux disorder; obesity; somatoform disorder; depressive disorder; borderline personality disorder; and obsessive-compulsive personality disorder.  (R. at 20.)  Despite those impairments, at step three, the ALJ found that Plaintiff had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations.  (R. at 25.)

Next, the ALJ determined that Plaintiff retained the RFC to perform the following: lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit, walk, and stand for 6 hours out of an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance; frequently stoop; occasionally kneel, crouch, and crawl; sustain a full 8-hour workday with breaks in 2-hour intervals; understand, remember, and carry out detailed but not complex instructions; make decisions; concentrate for extended periods; and respond to changes. (R. at 32.)  The ALJ further determined that Plaintiff could have no more than frequent contact and interaction with other people, and could not engage in fast-paced assembly line work.  (*Id.*)

At step four, the ALJ determined that Plaintiff could perform her past relevant work as a short order cook because it did not require the performance of work-related activities precluded by her assigned RFC.  (R. at 39-40.)  Because he found that she could return to past relevant work, the

ALJ did not reach step 5. Accordingly, he determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from April 2, 2013, through March 1, 2016. (R. at 40.)

## II. LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

21

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant

22

satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step

five to show that there is other gainful employment available in the national economy that the

claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either

by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational

testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A

finding that a claimant is not disabled at any point in the five-step review is conclusive and

terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.    Did the ALJ properly consider medical opinion evidence in determining [P]laintiff's residual functional capacity?

The [P]laintiff submits that the answer is "No."

2.    Did the ALJ properly consider the functional limitations resulting from all of Plaintiff's severe impairments?

The Plaintiff maintains that the answer is "No."

(doc. 16 at 3-4.)

### A.    RFC Assessment

Plaintiff argues that the ALJ failed to properly consider Dr. Mount's opinion regarding "the

extent, severity[,] and functional limitations resulting from Plaintiff's mental impairments," and

failed to provide a basis for rejecting this opinion in determining her RFC. (*Id*. at 1, 12.) The

Commissioner responds that the ALJ properly evaluated the opinion evidence. (doc. 19-1 at 8.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite

recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical

assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts

24

may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012). Every medical opinion is evaluated regardless of its source. *Id*. at § 404.1527(c)(1). Generally, an opinion from an examining source is given more weight than the opinion from a non-examining source. *Id*. However, the "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, 1994 WL 499764, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). The ALJ is also free to reject the medical opinion of any physician when the evidence supports a contrary conclusion. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981). Moreover, "[w]hen a treating or examining physician's opinions are inconsistent with other substantial evidence in the record, the opinions are not entitled to any specific weight in the ALJ's decision." *Smith v. Comm'r of Soc. Security Admin.*, No. 4:12–CV–00625–DDB, 2014 WL 4467880 at *3 (E.D. Tex. Sept. 9, 2014); *Morvant v. Comm'r of Soc. Security Admin.*, No. 12–CV–2716, 2014 WL 868912, at *9 (W.D. La. Feb. 28, 2014) (same).

Here, the ALJ specifically referenced Mr. Killion's testimony, and the medical evidence from Drs. Nguyen, Herman, Wilson, Phelan, Fritz, and Mount. (R. at 24-25, 27, 30, 34, 36-38.) In making his RFC determination, he explicitly gave considerable weight to Mr. Killion's opinion that

70 percent of Plaintiff's difficulties stemmed from her mental impairments, partial weight to Dr. Nguyen's report, and "more weight" to Dr. Herman's findings. (R. at 34, 37.) At step two, the ALJ identified Dr. Mount's examining medical opinion that Plaintiff was moderately to markedly limited in her abilities to perform tasks, was unlikely to tolerate having her work judged and evaluated, would not benefit from a supportive environment or accommodations, could not sustain a normal workday or week without significant interruptions from psychologically based symptoms, and would miss 3 or more days of work per month. (R. at 25.) At step three, he noted Dr. Mount's findings that Plaintiff could recall 3 of 5 words after 5 minutes, could repeat 5 digits forwards and 3 backwards, could not do Serial 7's, but could do Serial 3's, and could spell "world" backwards correctly. (R. at 27.) While he identified Dr. Mount's findings, he did not directly discuss or assign weight to them in determining Plaintiff's RFC. (*See* R. at 32-39.)[3]

Although the ALJ stated that he re-reviewed and considered the entire record, he never explained why he disregarded Dr. Mount's opinions regarding Plaintiff's mental limitations in her abilities to perform work in making his RFC determination. (*See* R. at 32-39.) This was error. *See James v. Berryhill*, No. 3:17-CV-514-D-BH, 2017 WL 5713399, at *7 (N.D. Tex. Nov. 1, 2017), *adopted by*, 2017 WL 5691166 (N.D. Tex. Nov. 27, 2017); *Ortiz v. Berryhill*, No. 3:16-CV-75-M-BH, 2017 WL 1185273, at *9 (N.D. Tex. Mar. 3, 2017), *adopted by*, 2017 WL 1184225 (N.D. Tex. Mar. 29, 2017); *see also Foley v. Colvin*, No. 3:14-CV-4176-BN, 2015 WL 5836173 at *5 (N.D. Tex. Oct. 2, 2015) (finding that, even though the ALJ identified examining medical opinions, his failure to "expressly explain the weight" given to these opinions was error).

_____

[3] At step three, the ALJ noted that "Dr. Mount undertook to explore the interplay between [Plaintiff's] physical and mental impairments," but gave considerable weight to his opinion only "as far as it [went]" on that matter. (R. at 28.) He did not directly assign weight to or discuss Dr. Mount's determinations in his RFC determination. (*See* R. at 32-39.)

26

B.       **Harmless Error**

Plaintiff argues that the VE's testimony establishes that the functional limitations assessed by Dr. Mount "would preclude an individual from engaging in substantial gainful activity." (doc. 16 at 12.)  The Commissioner does not dispute this argument; she disputes that Plaintiff had such limitations. (doc. 19-1 at 11.)

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required," and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363–64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).  In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).  Accordingly, to establish prejudice that warrants remand, Plaintiff must show that consideration of Dr. Mount's opinion evidence might have led to a different decision. *See id*. at 816 (citing *Newton*, 209 F.3d at 458).

The Commissioner argues that Dr. Mount's treatment records do not support the "extreme limitations" in his mental RFC assessment. (doc. 19-1 at 10.)[4]  Dr. Mount opined that Plaintiff was moderately to markedly limited in the areas of understanding and memory, sustained concentration

---

[4] The Commissioner also cites to *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011), to argue that Dr. Mount's mental RFC assessment "should be classified as brief or conclusory . . . as it consisted solely of word-circle and check-box findings without further explanation." (doc. 19-1 at 10.)  In *Foster*, the Fifth Circuit agreed that a questionnaire was not entitled to considerable weight because it was brief and conclusory, relied on old data, and there were no explanatory notes or supporting tests or examinations. *Foster*, 410 F. App'x at 833. Here, although the mental RFC completed by Dr. Mount is brief, it is accompanied by and based on the supporting examination from Plaintiff's clinical interview and mental status examination, which was conducted the same day the mental RFC was created. (*See* R. at 600-07.)  Accordingly, the mental RFC assessment is not the same kind of brief and conclusory statement that was at issue in *Foster*.

and persistence, social interaction, and adaptation, with many of her abilities being markedly limited. (R. at 604-605.) He further opined that Plaintiff was unlikely to tolerate having her work judged and evaluated by a supervisor; could not benefit from a supportive workplace environment or accommodations; and could not sustain a normal workday or workweek without significant interruptions from psychologically based symptoms. (R. at 606.) Although his records showed that Plaintiff was oriented and had a goal-directed thought process, average intellectual functioning, intact memory, and logical judgment and reasoning, they also showed that Plaintiff was depressed and labile, had no friends, and did not socialize. (R. at 601-02.) Additionally, testing showed her to have severe anxiety, severe depression, and to be above the optimal cutoff score for PTSD. (R. at 602.) Accordingly, his treatment records appear to support the limitations found in his mental RFC assessment.

Additionally, Dr. Mount's opinions and findings conflict with the opinions of Drs. Phelan and Wilson, the SAPCs. Dr. Phelan opined that Plaintiff was no more than moderately limited in the areas of understanding, memory, sustained concentration, and persistence, and that Plaintiff had no social interaction or adaptation limitations. (R. at 79-80.) Dr. Wilson opined that Plaintiff was no more than moderately limited in the areas of understanding, memory, sustained concentration, persistence, and social interaction, and that Plaintiff had no adaptation limitations. (R. at 110-11.) Both further opined that Plaintiff could understand, remember, and carry out detailed but not complex instructions, make decisions, concentrate for extended periods, interact with others, and respond to changes. (R. at 79-80, 111.)

Because the opinions as to Plaintiff's mental limitations are varied and not fully consistent with the ALJ's findings, it is not inconceivable that the ALJ would have included additional mental

28

limitations in Plaintiff's RFC assessment had he formally weighed Dr. Mount's medical opinions. *See McAnear v. Colvin*, No. 3:13–CV–4985-BF, 2015 WL 1378728 at *5 (N.D. Tex. Mar. 26, 2015) (finding remand was required because there was a realistic possibility of a different conclusion by the ALJ where the court was unsure of whether the ALJ considered the medical source's opinion and whether such a review would have changed the outcome of the decision). Additionally, the VE testified that Plaintiff could not perform any work with the mental limitations stated in Dr. Mount's mental RFC assessment, and Plaintiff suffered prejudice because the ALJ concluded that she could perform her past work, which led to a finding of not disabled. *See Foley*, 2015 WL 5836173, at *5. Even if the ALJ had afforded Dr. Mount's opinions no weight at all, it is not the duty of the reviewing court to "substitute its judgment of the facts for the ALJ's, speculate on what the ALJ could have done or would do on remand, or accept a *post hoc* rationalization." *See Benton v. Astrue*, No. 3:12-CV-0874-D, 2012 WL 5451819 at *8 (N.D. Tex. Nov. 8, 2012).

In conclusion, the ALJ's error was not harmless because it is not inconceivable that he would have reached a different decision had he properly weighed Dr. Mount's assessment.[5] *See McAnear*, 2015 WL 137828, at *5; *see also Singleton v. Astrue*, No. 3:11–CV–2332-BN, 2013 WL 460066 at *6 (N.D. Tex. Feb. 7, 2013) (finding the ALJ's failure to consider a medical source opinion was not harmless error because the court could not say what the ALJ would have done had he considered the opinion, and had he considered the opinion he might have reached a different decision).

## IV. RECOMMENDATION

Plaintiff's summary judgment motion should be **GRANTED IN PART**, the Commissioner's

---

[5] Because this error requires remand, and the ALJ's consideration of Dr. Mount's opinion may affect the remaining issue, it is unnecessary to reach that issue.

summary judgment motion should be **DENIED IN PART**, and the Commissioner's decision should

be **REVERSED IN PART**, and **REMANDED** for further proceedings.

　　**SO RECOMMENDED** on this 28th day of August, 2018.


_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE



## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

　　A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE